We'll hear argument first this morning in Case 14-8349, Foster v. Chatman. Mr. Bright. Mr. Chief Justice, and may it please the Court, the prosecutors in this case came to court on the morning of jury selection determined to strike all the black prospective jurors. Mr. Bright, maybe you could address first the question we raised on Friday with respect to which court certiorari should be directed to. Yes, Your Honor. We filed this petition originally, certiorari to the Supreme Court of Georgia. And, of course, this court in Sears v. Upton had issued certiorari, this is in 2010, to the Supreme Court of Georgia in a similar situation. It appears to us from looking at this over the weekend that R.J. Reynolds Tobacco Company v. Durham County, which the Court decided in 1986, the Court said that unless there was positive assurance that the decision was not a ruling on the merits, then the writ went to the State's Supreme Court. And the Georgia court, while it has rules and statutes and its own opinions that are not totally in harmony with one another, the rule, nonetheless, is that a certificate of probable cause, which is what was denied in this case, is to be granted if there is arguable merit to the case. Do you think that affects the scope of our review? In other words, are we addressing just whether there is arguable merit to the claim, or are we addressing the claim on its own merits? I think what this Court has done in all these cases is apply Yilts v. Nunemaker to look through to the last reasoned decision, and that would be the decision of the habeas corpus court. In Georgia, typically, the habeas court rules an application is made for a certificate of probable cause to the Georgia Supreme Court, and that is often denied summarily. It is denied summarily, as it was in this case. Scalia, you really don't understand that. You say we would be reversing the Georgia Supreme Court, not the habeas court, right? And all that the Georgia Supreme Court held is that there was no arguable basis for its accepting review. So if we reverse that decision, we tell the Georgia Supreme Court, you're wrong, there is an arguable basis for your accepting review, so we ought to remand to that court requiring them to accept review, it would seem to me. How can we reverse them on an issue they never considered? Well, that's what happened in R.J. Reynolds. I mean, there you had an almost identical situation where you had an intermediate appellate court that had ruled, and then you had the North Carolina Supreme Court denied review. And the question was, do you issue the writ to the intermediate appellate court or to the North Carolina Supreme Court? And this Court decided, and Justice Blackmun writing for the Court said, we want to give practitioners, we want to end the confusion about this. And so it goes to the State Supreme Court. There's no difference in our situation here and the situation that R.J. Reynolds was saying. Kagan. But you're saying in that case or in other cases, and if so, which other cases, that in that situation we nonetheless addressed the reasoning of the intermediate court? Is that what you're saying? You did in Sears v. Upton case out of Georgia, 561 U.S. 945 in 2010, that was certiorari to the Supreme Court of Georgia, but it came up in exactly the same posture of our case. Is there an argument that the petition for certiorari could go to the trial court? I mean, our statute says that it goes to the highest court in which review could have been had, I think is the statute, right? Which sounds like the Georgia Supreme Court. On the other hand, as Justice Scalia said, they haven't really directed their attention to the issues before us. I'm just not sure to me that it's an option to go to the Georgia trial court. Or is that incorrect? Well, what this Court has said, both in the R.J. Reynolds case and then that was followed in Grady v. North Carolina last year, 2015 case this year, in which once again there was an intermediate court decision denied by the North Carolina Supreme Court. I mean, I can remember all the way back to 1960, there was Thompson v. Louisville where certiorari was to the police court in Louisville, Kentucky. And it was denied because no court in Kentucky could take the case because the fine was less than $20. But I think these cases, much more recent, decided by the Court 1986 and this year. You're putting together two rules that you say we've established. One is, Justice Blackman said to end the confusion, the petition should be addressed to the Supreme Court. And then you said we have cases, look through cases. If the Supreme Court has said just denied, nothing more than denied, we look back to the last reasoned decision. Those are both decisions of this Court, and that's what you're relying on. Well, and they're not mutually exclusive. This Court can look back through to the last reasoned decision in making its decision in this case, and I believe that's what it should do. But at the same time, the Court's opinions appear to us on the quick research we did over the weekend on this, that R.J. Reynolds and the subsequent case say that the certiorari would issue to the George Supreme Court. And we listed it that way. And then when the case was docketed here, it was listed that the lower court was the superior court of Butts County. Alito, what if the State Supreme Court wrote a very short opinion and said we're not going to determine whether there was in fact the only issue we're going to determine is whether there's any arguable merit to this, and then you say that the whole issue of whether it was a correct application of Batson is the issue that we have to decide? I think under R.J. Reynolds, I think that's this Court's law, yes. Can I ask you another question about another preliminary issue before you get to the underlying question in the case? The superior court said on page 175 of the Joint Appendix that the issue of the Batson violation was not reviewable based on the doctrine of res judicata. And then it later said, and this is 192 of the Joint Appendix, that it will review the Batson claim as to whether Petitioner has shown any change in the facts sufficient to overcome the res judicata bar. Now, if you put those two together, you could argue that the superior court decided only a question of State law, namely whether the situation here was such that there could be review of the Batson claim. What is your response to that? Well, the State doesn't argue that. And I think the reason for that is because the Court said we're moving — the Court is going to address Step 3 of Batson, and it said Foster's Batson claim is without merit. Well, is it a question of Federal or State law as to whether or not the Petitioner has shown a change in facts sufficient to overcome the res judicata bar, the page 192 language that Justice Alito quoted? Is that a State law question or a Federal? That's a State law question. And here, the Court decided it, but I would point out Justice Kennedy. Well, if it's a State law question, they've resolved it against you. What do you — then what do you have to argue? No, no, no. I think you have to say it's a Federal question. No. In order to decide it, the — this is exactly like Ake v. Oklahoma, where the court — the Oklahoma court had to decide the Federal question in order to decide whether it had jurisdiction over the issue. And this Court held in Ake that where the court has to decide the Federal issue and it did in this case. It clearly decided the Federal issue and found that the Batson claim had no merit. So it has decided the Federal issue, and there's no contest about that in this case. Scalia. Explain to me why deciding the Federal issue was essential to its deciding the State res judicata issue. Because it framed the question as being that it would look at the Ake versus — excuse me — the Batson claim, and that if there was merit to that claim, then the court would grant the writ on it. On the other hand, if it found that there was not merit on it, then — Scalia. You think it was saying whether there's res judicata or not depends on whether the new claim has any merit? I think exactly. That's a very strange application of res judicata, it seems to me. I thought it was whether there were changed facts. I thought it was sufficient enough. Well, the judge realized that you can bring an issue that's been litigated already before. Right. Direct appeal. Right. In habeas if there are. Even — even — right. Even if it would, you know, produce a different result, right? Right. If the facts are such that it would produce a different result. Right. Mr. Breyer, did the Court, in your judgment, do de novo review? Didn't it say that it did — basically, it was going to do step three of the Batson charge? Yes, that's exactly what the Court said, yes. And so that's a ruling on the merits. I think it's — I think the Court said the Batson claim is without merit. That seems like a ruling on the merits to me. Well, I think it said after — after redoing. After considering these other facts. And we think there were some legal errors made there. But, yes, after considering these facts, the Court said that the claim was without merit. The Court said that it would reach step three again on the basis of the new evidence presented. And so they did it all over. And I guess that's — we must take that as what happened. They did not apply a res judicata bar. No. I mean, in Ake, this Court said when the resolution of the State procedural law question depends upon a Federal constitutional ruling, the State law prong is not independent of the Federal claim. And this Court has jurisdiction. And that's on page 75 of 470 of the United States. Well, I don't want to belabor the point too much, but you — are you arguing that Georgia res judicata law is this? If someone comes up with any new fact, the — the thinnest new fact, that is sufficient to wipe out the res judicata bar and allow the Court to get to the merits of the claim? Is that your argument? That's your understanding of Georgia res judicata law? That's not my understanding. My understanding is the evidence has to be sufficient enough that the Court does what it did in this case and rule on the merits of the issue. And that's what happened here. This was not a matter of just adding one more leaf to the basket. And we really want you to get to the merits. But why is that in conjunction with Justice Scalia's question? Why is that an issue of Federal law? Because the Court decided that's an issue to decide the underlying State law issue. And I think Aik is pretty clear on this. And I commend it to the Court's attention. We didn't — since the State didn't raise this, either in their opposition to cert or in their brief, it's not briefed before this Court. But I think that's the deciding case on this. Roberts. Thanks, counsel. I think we have your argument on the point. Thank you. Okay. Thank you very much. If I could just say what happened here was that the prosecutors had identified the African-Americans by race. They had rated them against each other in case it came down to having to select a black juror. But the prosecutors said the reason for concentrating on the black jurors was that if you had informed them, you would present a Batson challenge, and therefore it was necessary for them to see if there was a race-neutral ground for disqualifying the black jurors. Right. Two answers to that, Justice Ginsburg. I mean, what the lawyers did here, these are lawyers that practiced here for a long time in Rome, Georgia. They said the prosecutor always strikes all the blacks in the jury. That's been the historic practice. We think they're going to strike all the blacks in the jury in our case. But last year, the Supreme Court of the United States decided Batson v. Kentucky, and we asked the court not to let that happen in this case. Now, of course, if the prosecutors wanted to avoid a Batson challenge, they could have not discriminated. That would have been the first thing to do. But secondly, with regard to the information that's collected here, it doesn't seem like it's information just to exercise strikes when they say if it comes down to having to take an African-American, Ms. Harge or, in another place, Ms. Garrett, might be okay. And the district attorney himself said Marilyn Garrett has the most potential of the black prospective jurors. In other words, the blacks were taken out of the picture here. They were taken and dealt with separately. And over the weekend, the jury questioning ended on a Friday, and the judge said, All right, over the weekend, you've got your chance to decide who you're going to strike. And they knew exactly who they were going to strike because the jurors are listed in order. The state goes first, and if it accepts a juror, then the state accepts, and that juror's on. There's no going back. There's no backstriking, or there's no striking people here and there. They developed three strike lists, and one of those strike lists was a list headed definite no. These are the people absolutely are not going to be on this jury. There are only six jurors listed on the list of definite no's, and the first five are African Americans. The sixth is a juror who made clear during the voir dire process that she could not impose the death penalty under any circumstances. The state moved to strike her for cause. The judge probably erred in not granting that strike. But even she ranked behind the black jurors in terms of the priorities that the were women. And I guess three out of the four African Americans were, who were struck, were women. How does that? And then that explanation has just kind of fallen out of the case. How does that affect the analysis? Well, he did accept women, though, as well. If you'll bear with me just a moment. The Court had not yet held that Batson applies to death. The Court had not yet held in J.E.B. that Batson applied to women, but the Court did say in J.E.B. that, of course, it could be used as a pretext, women, for striking on the basis of race. In this case, the prosecutor struck three white jurors, and then he struck the three black jurors, women, the three black women and the three white women. The final question. Sotomayor, Mr. Bright, Mr. Lanier answered yes when he asked when, during the trial, when he was asked whether he had done, I don't know if, oh, no, it was on the motion for a new trial hearing, whether he had done the same extensive background check on all the jurors, white and black. Did you find any evidence of that extensive black background check? No. The only — what that's talking about, and the investigator said this in his deposition, was the color, race-coded color list, those first four lists you have in the Joint Appendix, in which the blacks are marked with a B and highlighted in green with a marker up at the corner saying green designates blacks. So your understanding of that statement was that all — he had only done an extensive search on the blacks on the list. Well, it's clear. Mr. Lundy had prepared a list, notes, in which he talked about just the black jurors in the case. And I think the State concedes in its brief that the focus was on the black jurors. During the trial, did defense counsel, when he made his initial Batson challenge — not in the papers, but at trial — did he again say that this was part and parcel of the prosecutor's pattern? He didn't say that, but I'd point this interesting thing out. When they discussed the Batson motion before trial, there was never a suggestion that there wouldn't be a Batson hearing. Everybody knew what was going to happen, that all the blacks would be struck and then they'd have a hearing after that happened. But the defense had basically put their motion in writing and relied upon that throughout the jury trial. I was just surprised that we didn't hear about this preparation for a Batson hearing until the habeas. Well, the defense lawyers at trial did move for the prosecution's notes, and the prosecution opposed that. They were very strict on not giving up their notes. Then when the prosecutor testified on the motion for a new trial, he did something I've never seen a lawyer do before. He cut a bargain, sort of, with the judge and the lawyer, saying, I will testify, but only if I don't have to show them my notes. I mean, basically, the rules of evidence are you testify and rely upon notes. The other side can see the notes. But here, these notes were guarded until 2006, when we obtained them through a freedom of information, or what they call Open Records Act in Georgia. The prosecutors said that you — they said, we never wrote, saw, authorized, or relied on those notes. And you didn't call the prosecutors to test the veracity of that assertion. No, but all the prosecutor talked about were the color-highlighted notes. Each prosecutor filed an affidavit, which are in the — in the joint appendix at 168. And all they said was, we didn't highlight it in green, and we didn't tell anybody else to highlight it in green. And then Mr. Lanier says, and I don't have anything else to say beyond what I said at the Batson hearing and the motion for a new trial. Mr. Pullen said — the only other thing he said is, I didn't use those green highlighted lists in choosing the jury. But, of course, that's just the first few pages. What's damning about this is not so much that, but the definite no's list, the misrepresentation to the trial court that Ms. Garrett — that they wanted Ms. Garrett. That's what they told the trial court, and the trial court relied upon that in denying the Batson motion, that this showed their openness to having — Ms. Garrett was on the definite no list. She was on each of the strike lists. Ms. Garrett was never in the running to be on this jury. But they represented to the court that because another African-American, Shirley Powell, was excused for cause — there were five African-Americans in the veneer at the start when they got ready to strike the jury. But one said, it turns out I know somebody in the family. She was excused for cause. And the prosecutor said — made it — implied clearly that had it not been for that, that Ms. Garrett would have said. At the same time — and they're still arguing this both ways, that they both wanted her and didn't want her — they give 11 reasons for why Ms. Garrett would not be a good juror, that she's impudent and she doesn't respect the court. If you believe all the things they said about her, they would never want her as a juror. But those things, I would submit, are not really valid in terms of — in terms of the reasons, because the reasons they gave here, many were demonstrably false and not supported by the evidence, including reasons they gave about Ms. Garrett. They were inconsistent. Some were completely incredible. And they applied to white jurors. Some of these reasons applied to white jurors who had the same characteristics as the African-Americans who were struck. And then lastly, and what's so important under Miller-El, they didn't question the jurors about the reasons for striking them. They gave reasons for striking them. One question would have cleared up some of these. And Miller-El says that the failure to engage in any meaningful voir dire about whatever your reason is, is evidence suggesting that the explanation is a sham and a pretext. And — SOTOMAYOR. Mr. Bright, I have found some circuit courts who have a rule on appeal or on habeas, which is, if they can find one legitimate reason for striking a juror, that's enough to defeat a Batson challenge. Do you believe that's an appropriate rule? Are you suggesting a different approach to the question? BRYANT CUMMINGS. Well, it can't — I would suggest it can't possibly be, because this Court said, in Justice Alito's opinion in Snyder v. Louisiana, that where the peremptory strike was shown to have been motivated in substantial part by race, that it could not be sustained. And — excuse me — I would suggest to you, it shouldn't even really say substantial, because if this Court, as it's said so many times, is engaged in unceasing efforts to end race discrimination in the criminal courts, then a strike — strikes motivated by race cannot be tolerable. And of course, as pointed out here in the mickey, this is a serious problem, not just in this case, but in other cases where people come to court with their canned reasons and just read them off. That happened in this case, where one of the reasons that was given was just taken verbatim out of a — two of the reasons given were taken verbatim out of a reported case. So you don't have the reason for the lawyer in this case. He said, my personal preference. It wasn't his personal preference. It was the personal preference of some U.S. attorney in Mississippi who gave that reason, and then it was upheld on appeal by the Fifth Circuit. But I — we would suggest that the standard is at least what Snyder says, because when you have both — you can always have, as Miller L. recognized. Kennedy. Well, in response to Justice Sotomayor's question, if the prosecutor argues a laundry list of reasons for striking the black curb, and some of those are reasonable and some of them are implausible, how should the Court approach the Batson analysis? I think the Court looks at which reasons are pretextual. I think the fact that there is a laundry list suggests in and of itself that the Court should scrutinize the reasons very carefully, should be suspect of the reasons, because otherwise what the Court is going to do is just simply encourage prosecutors or any party in a case, since Batson applies to everyone, is going to encourage a party to just give as many reasons as possible and hope that one will be acceptable. And in this case — Alito Don't you think this is a case-by-case thing? Suppose there's one reason that's a killer reason. Like, this individual has numerous prior felony convictions, all right? And then the prosecutor says, in addition, and this person didn't — he looked down at the floor in answering the questions and didn't seem to pause and didn't seem to understand some of the questions. So under a circumstance like that, couldn't the Court say, well, the one — there's one reason here that would — that is clearly a justification for a preemptory strike. We don't have to determine whether there's evidence that the person was looking down at the floor. Well, of course, Batson says, and the subsequent cases say, you look at all relevant circumstances. It may be if all the circumstances that are there are the ones you said, then you would come to the conclusion that, of those two reasons, that there was a valid reason. But I would suggest that where you have — like we have here, I mean, we have an arsenal of smoking guns in this case. A lot of those smoking guns were in the original decisions by the Georgia courts. It seems to me what you would have to establish to reverse the Georgia courts is that the new smoking gun, assuming that all the rest were not enough to demonstrate a Batson violation, the new smoking guns would tip the scale. Isn't that the issue that the Georgia courts decided? When the new smoking gun tells you that the prosecutor misrepresented facts and gave reasons that were absolutely false, demonstrably false reasons, and those are not clear before, but you have that now. I mean, Batson turns on the feasibility of the reasons. It turns on the credibility of the prosecutors. Scalia. But all I'm saying, and you seem to be agreeing, is that it is not the overall Batson judgment that's before us, but rather the judgment that the new evidence did not suffice to create a Batson violation where none existed before. No. Our position is that when you look at the new evidence, with all the evidence at trial, that all relevant circumstances considered together, considering that a lot of these reasons, we now know from the notes, we now know from the notes that there were misrepresentations with regard to these reasons. I mean, the Georgia Supreme Court, just as an example, Justice Scalia, upheld the strike of Ms. Garrett on two bases, that she was a social worker and that her cousin had been arrested for drugs. She was not a social worker, and secondly, the prosecutor didn't find out until after trial about her cousin's arrest, so it couldn't have possibly been a reason for the strike. So that — So you're saying, in answer to Justice Scalia, that when you had the notes, those were the prosecutor's justifications in the first round? They do that, and they show misrepresentations to the Court, and they show an overarching goal of separating out the African-American citizens, treating them differently, and then putting them on this list of all — of definite notes. And, Mr. Bright, just to make sure I understand, all the notes in the prosecutor's files were new, is that right? New. New to this case, yes. Yes. And there were three people that just involved the two prosecutors and the investigator who put those together. I would like to reserve the balance of my time. Thank you, counsel. Ms. Burton. Mr. Chief Justice, and may it please the Court, I believe there are two important factors in this case when reviewing the entirety of the evidence. One is Petitioner bears the burden of establishing clear error. I'll ask you as well to address the certiorari question first. And respectfully, I disagree with Petitioner's counsel on this issue. I believe Norfolk Western Railway v. Hiles, which is this Court's opinion, indicates that — or states that if there is an issue raised in the lower court and it is raised in the State's highest court, in this case the Georgia Supreme Court, but the Georgia Supreme Court denies discretionary review, then it is before this Court on certiorari from the lower court. So the problem is I don't think this is discretionary review. The Eleventh Circuit found it's not under Georgia law, read its opinion. It seems pretty grounded in the stated law of Georgia. Yes, Your Honor. And that is a pretty hot-button issue I know right now in the State federal courts in Georgia. But our position in that — in those cases, and I think there is a case before this hearing on that same issue, is that Georgia statute, the Georgia statute specifically says that is a discretionary appeal. The 1975 Habeas Corpus Act made it a discretionary appeal, I think, because the Georgia Supreme Court was just getting inundated with appeal after appeal. And has the Georgia Supreme Court ever said anything, one way or the other, as to whether it's discretionary or not? In two of their cases, Reed v. Hopper, which is 219 Southeastern 2nd, 409, and Smith v. Nichols, which is 270 Southeastern 2nd, 550, 1999, they both state those as discretionary. But they have not — they have not answered a certified question on that issue. Could you give me the Reed v. Hopper? Yes, Your Honor. 219 Southeastern 2nd, 409, that's a 1975 case. Are certified questions available in Georgia? Could we certify a question to the Georgia Supreme Court? I believe you can, Your Honor. Breyer, I looked at the statute. The statute says in a habeas case, State habeas, that the Georgia Supreme Court must review it. It says it must review it unless it's without merit. I forget the exact words I was looking for. Well, in State habeas, I think it's 914.52, the statute, it takes State habeas cases out of other appellate review and makes that just discretionary. The Georgia Supreme Court can't do that. But then I've been looking at the wrong place. You heard your brother here say he quoted some words. I don't remember the exact words, but they were exactly what I'd read, and it was from a statute in Georgia. And the Georgia statute said — I just can't find it in my book here, sorry. The Georgia statute said they shall review the case unless it's without — it's totally without merit, something like that. Does that ring a bell? Does it ring a bell, what I'm saying? It does ring a bell. Or what are the exact words? I do not know the exact words, but I believe the other ones. The exact words are that a certificate of probable cause will be issued when there is arguable merit. Yes. That's it. But I believe that's Rule 36 of the Georgia Supreme Court. I think it's 914.52, if there had been compliance with that, right? Okay. Breyer. Does that govern this case? I believe the statute would trump the Georgia law. Does the word that the Chief Justice just read from Georgia law govern this case? The answer is yes or no. No, I believe it's discretionary. They do not govern this case. I believe it's discretionary. What, in your opinion, is the Georgia statute that says that those words you just held do not govern this case? I believe it's 1914 and correct me, I'm certainly open to correction. 1914.52 states that State habeas is taken out of other appeals, which are normally directly appeals, or prisoner appeals, and they are discretionary. Okay. Thank you. Scalia. I suppose that a court could have a discretionary view, but could provide by rule that in the exercise of our discretion we will grant any of these unless it's patently wrong. Could you – maybe that's what's happened here. And if you use your discretion to enact a rule which says you will take cases of a certain court, does the taking of those cases still remain discretionary? That's a nice question, isn't it? I think the taking of the case does remain discretionary if they find it has argument merit. It is discretionary. And the two cases I cited specifically reference. You've just decided that you will uniformly exercise your discretion in a certain way. Correct. But maybe I'm misunderstanding what you're saying. You're saying there is no such uniform determination that they will exercise their discretion in a certain way, that they are insisting upon their discretion being discretionary. Is that correct? That is my understanding, because this law applies to not just, obviously, death penalty cases, but the multitude of non-death penalty cases. I'm sorry. I'm so confused I can't even. The State habeas process is different than the regular appeal process. That's correct. On the regular appeal process, they look at each case, each case with discretion. On a direct appeal process, it is, and certainly a capital case, it is mandatory review. Okay. In State habeas, they have a rule, an internal rule that says, we'll take every habeas case unless it has no arguable merit, right? If I may rephrase. I think the rule says that they will take a case if it has arguable merit. Generally, they do not take a case. Sotomayor In the positive. Right, right. Sotomayor So what would lend us to believe that they didn't look at the merits and say there was no arguable merit, that they just said, we're too busy, we don't care if there's arguable merit? Do you believe they did that? I would never say they were too busy to take the case. I'm sorry. I said, I would never say they were too, that would be their reason, but I think they would say, we've looked at this case, because they do have the records before them, and we don't see arguable merit to take this case up for review. So that is a decision on the merits. There's no arguable merits. I think it is a finding there's no arguable merit to the application that there has been error below. Okay. If that makes it any clearer. Now it's clear. And in your view, cert should have been granted to the Georgia Supreme Court? I believe it should have been granted to the State habeas court. Because of that discretionary review and because I believe this court has said in Michigan v. Long that if it's unclear, it comes from the State habeas court. Can I just ask one more quick question about this? You made reference, this is an issue that's being litigated in the Georgia courts, is that right, in the Eleventh Circuit? That is correct. This precise issue? This issue. Thank you. To um. What issue is that? Is it the issue of which court certiorari should be directed to? Well, it's. The issue of what? What is the issue that is being litigated? Am I right that the issue that's being litigated is whether the Supreme Court review in cases like this is discretionary or not discretionary? That is correct. And in those cases, obviously, it's coming up from Federal court, so we're dealing more with Ilst and Harrington v. Richter and sort of a different scope of things in that regard. And this question is in both the Georgia Supreme Court and in the Eleventh Circuit? It is currently in the Eleventh Circuit. I don't believe we have a case pending now in the Georgia Supreme Court on that particular issue. But I do believe there is an issue up here in a case, Jones v. Chapman, where it is they've asked for rehearing. Do you think this would be an appropriate case for us to exercise our discretion to certify the question to the Supreme Court? We would certainly like an answer from the Georgia Supreme Court on that issue. I think the Eleventh Circuit would like that as well. I think it would clear up both State and Federal law for a number of things. Ginsburg-Miller There's a statute that permits the Georgia Supreme Court to accept certified questions. Do you know anything about the history of requests for certification? Some States have such a process, but the State Supreme Court rejects the question. I do not, Your Honor, and I apologize for that. Scalia What if we hold in this case that it is not discretionary review, and then in these cases that are pending, the Georgia Supreme Court says it is discretionary review? Who wins? Is it ultimately a question for us or for the Georgia Supreme Court? I think it's ultimately a question for the Georgia Supreme Court as to what their law is, what the State law is. Kagan Me too. Can I go to the merits? Is that all right? Okay. Unless other people? Okay. Look, you have a lot of new information here from these files that suggests that what the prosecutors were doing was looking at the African-American prospective jurors as a group, that they had basically said, we don't want any of these people, here's the one we want if we really have to take one, but all the evidence suggests a kind of singling out, which is the very antithesis of the Batson rule. So, you know, I mean, isn't this as — I'm just going to ask you, isn't this as clear a Batson violation as a court is ever going to see? I don't think it is. And I think because these notes that we have, they don't undermine any of the findings that were given by the prosecutor in his strikes, particularly of Mr. Hood and Ms. Garrett. They certainly can be interpreted in two ways. In our response brief to this Court, we don't know when we say, you know, this is why these highlights are there. There's a reasonable explanation, just as Mr. Foster has given speculation that it's his arguments. We don't know. But when they're— Breyer, what's the reasonable explanation? The reasonable explanation in this case is 4 months prior to trial, as was previously argued, Batson had just come out, Batson is new, 4 months prior to trial, defense counsel files a motion and says, the strike of any black juror, we're filing a Batson challenge. Two weeks prior to trial, he says, he files a motion and says, I'm — there's racial disparity in 179 jurors, and that's the list that's challenged, the 179. There's racial disparity of black prospective jurors on that list. The day of trial, he refiles that. So I would be more surprised, quite frankly, if there wasn't some sort of highlighting or explanation. Breyer, the argument you're making here is that, is that the reason he highlighted all the black jurors in green and said black, what about the black jurors, and did all these different things, was because he was preparing a defense in case of a Batson challenge. Correct. All right. Now, if that's correct, why is this — is this the first — was this argument made before your main brief in this case? And it was not. In several years, yes or no? It was not, and that's in the case. It was not. So if that had been his real reason, well, isn't it a little surprising that he never thought of it or didn't tell anybody until you raised this argument in your main brief? And — and I would — I would say that's on State Habeas Council. We relied on our race judicata bar throughout State Habeas, and then after that, basically defended the factual findings of the State Habeas. All right. It seems to me you have two arguments. One is this argument that he never thought of, apparently, at least never thought to tell you until quite recently, and the other, after years, and so it's hard to believe that's his real reason. And then there's a second argument that he had about 40 different reasons, and at least some of them could be valid. Okay. Now, if my grandson tells me, I don't want to watch, I don't want to do my homework tonight at 7 because I'm just so tired, and besides, I promised my friend I'd play basketball, and besides that, there's a great program on television, and besides that, you know, I really — my stomach's upset, but I want to eat spaghetti. And so he's now given me five different reasons. What do I think of those reasons? Well, in this case, and again, I think this is one may be valid. Correct. And the other ones also may be valid, but they all may not be as strong as the first one. But in this case, I think the important part. Well, wait. The point is he gave 40 different reasons, and the very fact that he gives 40 different reasons, and many of them are self-contradictory, obviously not applicable, totally different from — you know, that's why I use my grandchild's analogy. All right? And so I would say my answer to my grandchild is, look, you're not too tired to do your homework. And I think any reasonable person looking at this would say, no, his reason was a purpose to discriminate on the basis of race. Now, tell me why I'm wrong. I think because you have to look at the time period this was done. This was done not, you know, a year after Batson came out. And even throughout the transcript, people, the defense counsel and the prosecutor says, we don't really know where Batson's going. So in this case, the prosecutor, dealing with Batson for the first time, the first time in history anybody has had to put strikes on the record of the prosecution. Kennedy, he puts down, if it comes down to having to pick one of the black jurors, was that Ms. Garrett might be okay. And that's Mr. Lundy. That's the investigator. Well, but that seems to me to undercut the argument, well, they're just feeling their way and so forth. They've made a mistake. They've made a mistake of law in Batson. Sure, it was new, but they're wrong. Well, first let me say, I think that's why there was a laundry list, because he was just espousing every reason he had. But with regard to Mr. Lundy's notes, and that was the investigator who says if we have to choose a black juror, she may be the best one. Who was responsible for the definite no list? The definite no list, nobody — the only person that was asked about that was Mr. Lundy, who was deposed and said he could not identify who wrote that list. So we don't know. There are only three possible choices. Right.  And it exists. And it exists. If the favor exists, it says definite no. Correct. And I don't think that is — I don't think that was a ranking of jurors, because when you look, they did score jurors throughout. But there were five African-American jurors on the definite — well, and one of them was Jarrett, as was pointed out, they said if we have to have one, let it be Jarrett. But Jarrett then shows up on the definite no list. Correct. And — Sotomayor, weren't we told that the only three people who did the investigation on Batson were the two prosecutors on the case and Mr. Lundy? So if Mr. Lundy says, I didn't make that list, it has to be one of the two prosecutors. It has to be one of the two prosecutors, and one was not there on the day it was struck. The jury was struck. Only Mr. Lanier was. But if that's not Mr. Lanier's thought process of this definite no list, and I don't see that that gets you to clear error in the striking of Mr. Hood or Ms. Jarrett. Ginsburg. Ginsburg. What do you do with the other — it just seems an out-and-out false statement. The reason that's given, one of the reasons for Jarrett's being struck is that her cousin was arrested. But then the prosecutor doesn't know that at the time of the what did. He doesn't know until after the what did that the cousin was arrested. So how could it possibly be a reason at the time of the what did? And I don't think the record bears that out. These notes, the highlighted notes that Petitioner wants to say, these were used during what did, these were used during the strikes, in those notes, and this is at Joint Appendix, page 256, Angela is written out beside Ms. Jarrett's name, in Mr. Hood's name, wrote down things he knew prior to the strikes, prior to what he knew about individual jurors, he wrote down as to Marilyn Jarrett, Angela Jarrett as a cousin. So, and then Mr. Lanier testified. Sotomayor, did the habeas court provide an excuse and say, I'm sorry, I didn't see. Didn't the habeas court say, accept that he didn't know at the time of trial, but he just knew that Lundy didn't want her? The habeas, what the, the habeas court actually credited the fact that Mr. Lundy had advised trial counsel that Angela Jarrett should be struck. Sotomayor, that was his explanation for why the prosecutor didn't know about the prior arrest, correct? No, I think the State habeas court credited that as one of the facts of the strike. That Mr. Lundy didn't want her. Excuse me. That Mr. Lundy didn't want her. He never credited or never said that he knew this, that he knew about the arrest. Mr. — actually, Mr. Lanier testified twice, though, that he was aware at the time of jury selection that he knew about. Mr. Lundy did, but the prosecutor didn't. Well, no. In the motion between trial, Mr. Lanier, the prosecutor, testified and said, I knew during voir dire, Mr. Lundy told me that. That's at Joint Appendix 105 and 112. Didn't he also testify, this is on 14 of the reply brief, it has come to our attention since the trial of this case that Angela Jarrett was arrested? It says on that page of the transcript, on that part of the transcript, which I cannot explain to you in contrast to in the notes, it is noted that she is the cousin prior to the jury selection, unless that means, and I've read it several times, since that time she's been dismissed from her job. Again, it's unclear as to the record. Alito What about the giving a reason for dismissing her, that she was close in age to the defendant? And she was in her 30s, he was 18 or 19? And when he initially strikes, when Mr. Lanier initially explains his strikes, he does state her age. So he is not trying to say she's 23. He states her age as 34. And throughout, the overall theme was, we don't want younger jurors. We're looking for older jurors closer to the age of the victim, age 79. So I think, you know, maybe the, no, it's not the most articulate framing of it, but I think it's more of a generational, she was younger. And that, the age, I don't think was a make or break factor. Working at Head Start with underprivileged children, a make or break factor. A similarly situated white juror also struck for that same purpose. Kagan But, Ms. Burton, I mean, wouldn't you agree, in a lot of these Batson cases, you'll have purported justifications, which they could support a valid peremptory strike, right? But that the question for a court is, well, but did they support this valid peremptory strike? In other words, what was the prosecutor thinking? Batson is a rule about purposeful discrimination, about intent. And so it doesn't really matter that there might have been a bunch of valid reasons out there if the, if it was clear that the prosecutor was thinking about race. You agree with that, right? Burton I think if his intent was to strike based on race. Kagan Yes. If his intent was to strike based on race, it doesn't matter that he could have had a different intent that would have supported a good peremptory strike. And so the question of whether, you know, someone or other might have been properly struck by a prosecutor isn't really the question. The question is on the total amount of evidence before us, including all these prosecutors' notes, what was going on with respect to each of these peremptory strikes. And then you have to deal with not just, oh, it could have been this or it could have been that, but you have to deal with all this information that what it really was, was they wanted to get the black people off the jury. And I don't think these notes show that. What the notes show, again, with Ms. Hood, Mr. Hood and Ms. Garrett, their contemporaneous notes taken at the time of trial as to each of these jurors are the reasons they struck them. I mean, there's no derogatory comments within those notes. Scalia Where there are, you know, other reasons that are plausible but could be phony, surely it's the judge that hears the testimony who's best able to judge whether asserted reasons are phony reasons or not. Isn't that right? Yes, Your Honor. And I don't believe that It's sort of hard for us to do it on a cold record. I mean, it's harder. It's harder, not impossible, but harder. Justice Scalia raises, of course, a very good point in the mine run of cases, but not in a case where all the evidence of intentional discrimination was not before the judge at the time. And, again, I don't think there's – I don't think there's clear error here on these notes of racial discrimination. Their strikes are sound. As to Mr. Hood, you would not want Mr. Hood on the jury regardless of his race, based on his reasons. The reason that he gives a laundry list, like I said, may well have been because we were in 1987 and you're just putting out everything you can because you're not exactly sure what you're supposed to do. Why weren't the notes turned over earlier? The notes were not turned over earlier, although it was brought up in the motion for new trial in November, right after the trial in 1987. And the prosecutor, Mr. Lanier, says, I will give my notes to the court to look at Enbank if defense counsel will do the same. Defense counsel chose not to do so. That issue was raised on appeal to the Georgia Supreme Court, direct appeal. The Georgia Supreme Court found it was work product. It didn't have to be turned over. When we got to State habeas proceedings, they filed an open records request under Georgia law, and they were immediately turned over. I don't think there was any argument about it at that point. Sotomayor, what did you do with the failure to ask Ms. Garrett any questions about the issues that troubled the troubled? For example, her cousin's arrest. There's an assumption that she has a relationship with this cousin. I have cousins who I know have been arrested, but I have no idea where they are in jail. I hardly – I don't know them. So – but he didn't ask any questions. Doesn't that show pretext? I don't – I'm not going to inquire because she might get off the hook on that. Well, I think a number of times, and I know this Court's precedent on not asking questions, particularly in voir dire as to people, but as to a number of issues, I think when you're in voir dire and you're asking questions, you don't necessarily care what the answer is, because with regard to Mr. Hood, if he had said, yes, I have a son that's been arrested, it's not going to bother me a bit that you prosecuted my son. And he may be going to do that. Sotomayor, stealing hookups, in my mind, is decidedly different than murdering people or attacking them the way this case was – this case was about. I can imagine a father – why can't you imagine a father saying, it was stealing hookups, he should have been punished? And he may well have, but it's a risk I don't – the prosecutor didn't. But that's what the record supports. Well, it's a risk the prosecutor didn't have to take. If you have somebody in – as I said, Mr. Hood could very well have said that, very well have meant that, never have been lying, but in my mind, I'm thinking he's going to get back there and he's going to think, oh, I don't know about that. Breyer. I want to ask you a different question before your time is up, and I'd like you to respond to the question that Justice Alito initially asked, and that is, is there an independent State ground here? Now, you're familiar with the record, and I read on page 192 of your record the decision, and the first paragraph supports your – the view that you would like to hold, I think, that this is based upon res judicata, which is a State matter. And then there is the paragraph that was read to you on page 195 and 196, where the judge says, the reason that I reached that conclusion is because the notes and records submitted by Petitioner fail to demonstrate purposeful discrimination on the basis that the race was the basis. Okay? That sounds like Batson to me. And then he goes on to say, and in addition, there is no good reason given, now or then. And then he concludes, accordingly, the Court finds the renewed Batson claim is without merit. So if I read just that paragraph, I would think the reason that the judge found in your favor is he decided the Batson claim in your favor. He didn't have to. He could have gone on some other ground, but that's the ground he did go on. But at worst, why isn't it ambiguous? And if it is ambiguous, then why don't we take, you know, I think it's what's in the long, you know, all those cases. If it's ambiguous, then aren't we required to assume that the judge went on the Federal ground? Okay? Now, that's both Alito's question. It's what I think is the hardest point for you to overcome, and I want to hear your response. I actually agree that it's unclear. I think that's the end of it, isn't it? It is the end of it. I think it's unclear. The other one other issue. What do you think is Georgia res judicata law? I think res judicata, in Georgia, if you have new facts or new evidence. The res judicata goes out the window. Then you, then the Court gets to look at the issue and go beyond.  If you have new facts or new evidence, if the Court, in this case, finds that they can review the evidence anew, and anew review is had, then I think you are beyond that bar. I don't understand what you've just said. Say it again. Okay. If you have a — if the issue has been decided on direct appeal, and then you cannot go back to it, a superior court obviously can't overturn the State's highest court. But when you have new evidence, such as in this case, and it is strong evidence that the Court feels like it has to go, it has to look at that evidence, and in this case it did, then I think you are beyond the res judicata bar. Yeah. I mean, I think that that's exactly how the decision is framed, right? Because the decision talks about claims that are not reviewable due to res judicata. It lists many, many, many claims, and then it lists a whole bunch of claims that are procedurally defaulted. And then this is in a separate section, the Batson issue, and it's in a section that's with all the other claims that there were merits determinations being made about. And the Court is very clear. First sentence, last sentence. First sentence, the Court finds the prosecution did not violate Batson v. Kentucky. Last sentence, on the merits, the person — the Petitioner loses. So this is what it is. As much as I would like it to be an adequate and independent State law ground, I'm not sure I clearly have it here. Alito, what do you make of the statement on 175, as a preliminary matter, this Court notes that, as cited by the Respondent, the following claims are not reviewable based on the doctrine of res judicata. And the first one it lists is the Batson claim. Does that suggest maybe the Court had two reasons for what it did? It's barred by res judicata and it would fail even if it were not. No, but that — Well, I'd like the — I'd like counsel to answer that. Wait, wait, sorry. Yes, I think, if anything, it is an alternate ruling. But doesn't Georgia have the rule, Georgia — the Supreme Court has said, Georgia law allows claims to be revisited on habeas when new facts have developed since the time of the direct appeal, because a claim that is based on facts that did not actually exist at the time of the direct appeal, which is this case, is essentially a different claim. That's what the Georgia Supreme Court said. Yes. New facts is essentially a different claim. Yes, Your Honor. You may be right or wrong as a matter of conclusion, but that's the law of Georgia. That is the law. Thank you, counsel. Mr. Bright, you have two minutes remaining. Thank you. Very quickly, let me first say that with regard to what Justice Alito quoted, that has just come to our attention since the trial of the case that Ms. Garrett's cousin was arrested, that was on May the 1st. That was after the death verdict had been returned in this case. Secondly, if you look at the joint appendix on page 56 and 57, where they give the reasons for striking Ms. Garrett, there's no mention of her cousin whatsoever in there. That's the time when she should have been mentioned after the strikes were made, and yet there's no mention of that at all. So I don't think there's any way — and then six months later, there's a motion for new trial, and now the prosecution is adding new reasons that it didn't give at the Batson hearing. It's saying she was a social worker. She wasn't a social worker. It's saying her cousin was arrested. They didn't know that at the time they struck the jury. They said she's low income, taking another thing out of United States v. Carlick. But you can't add reasons on into perpetuity. The reasons are the reasons articulated in Miller-Ellis. The prosecutor's got to stand or fall on the reasons. With regard to the questions, I just want to make one quick point on that, because there's not much time. But with regard to Ms. Garrett and Martha Duncan, who were both teachers' aides, who were at schools that were literally right in the same neighborhood, Ms. Duncan had kindergarten students. Ms. Garrett was Ed Start. No questions. What kind of children do you have, Ms. Duncan? I mean, Ms. Duncan, if you look at the — they also said familiarity with the neighborhood. Ms. Garrett lived like 18 or 20 miles away. Ms. Duncan lived — her school was 250 yards away, and she lived a half-mile from the school. Both of them answered that they weren't familiar with the area where the victim lived. Now, then, some more questions after those answers would have provided a difference, but instead, Ms. Garrett is treated as a liar, and Ms. Duncan is accepted and actually serves as a juror in this case. And there are other examples with Mr. Hood, particularly with regard to the child. If you had asked, what about your child who was arrested? He was put on probation — he was $180 of — can I have just a second? $180 restitution, and he went off to the — this is in the record — went off to the Navy, served this country honorably, got an honorable discharge, and came back. Thank you, counsel. The case is submitted.